IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

YANG MING MARINE TRANSPORT     )
CORPORATION,                   )
                               )
     Plaintiff,                )
                               )
vs.                            )        No. 2:08-cv-2202-DKV
                               )
                               )
INTERMODAL CARTAGE CO., INC. and )
GREAT WEST CASUALTY CO., INC.   )
                               )
     Defendants.               )

_____

ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

_____

This is a breach of contract and declaratory judgment action in which plaintiff, Yang Ming Marine Transport Corporation ("Yang Ming"), seeks reimbursement from the defendant, Intermodal Cartage Co., Inc. ("Intermodal"), for attorney fees and costs which Yang Ming incurred defending a wrongful death action which was dismissed, *Vicki Miller v. Nippon Carbon Co., Ltd., et al.*, No. 05-cv-2413 (W.D. Tenn). Yang Ming also seeks the amount of attorney fees and costs associated with bringing this action to enforce Intermodal's duty to defend. Before the court are the parties' cross motions for summary judgment filed August 31, 2009. Specifically, Yang Ming claims that under the terms of the Uniform Intermodal Interchange and Facilities Access Agreement ("UIIA"), as well as under the terms of an insurance policy between Intermodal

and Great West Casualty Co., Inc.,[1]  Intermodal was obligated to defend Yang Ming in the *Miller* action and failed to do so.  (Comp. ¶¶ 13, 20-22.)   In opposition, Intermodal claims that the facts underlying the *Miller* action did not cause a duty to defend and indemnify Yang Ming to arise under the terms of the UIIA or the insurance policy.  (Answ. ¶¶ 17, 18, 36.)   The parties have consented to having all proceedings in this case conducted by the United States Magistrate Judge, including entry of judgment, pursuant to 28 U.S.C. § 636(c).  For the following reasons, the court grants Yang Ming's motion for summary judgment and denies Intermodal's motion for summary judgment.

## I. UNDISPUTED FACTS

The *Miller* action arose out of a shipment of a container owned by Yang Ming.  For purposes of the cross motions for summary judgment, the court finds the following facts undisputed.

In 2004, Mitsubishi Logistics Corporation ("Mitsubishi Logistics") contracted with Yang Ming, a corporation organized under the laws of Taiwan, which is in the business of marine freight transport, to ship six loaded containers loaded with electrodes manufactured by Nippon Carbon Co., Ltd. ("Nippon") in Japan to Memphis, Tennessee.  (Doc. 28-1, Pl.'s Stat. of Mat. Facts ¶ 8; Doc. 42-2, Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 8.)  To

---

[1]  On August 28, 2009, Yang Ming filed a Notice of Voluntary Dismissal as to defendant Great West Casualty Co., Inc.  (Doc. 204.)  Intermodal is now the sole remaining defendant in this case.

facilitate the shipment, Yang Ming provided empty containers, to which Yang Ming held beneficial title, to be loaded with the electrodes in Japan and then to be transported to the United States where they were to be unloaded and then returned to Yang Ming. (Pl.'s Stat. of Mat. Facts ¶ 8; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 8.)  One of the six containers that Yang Ming provided was container number YMLU485206-1 ("the container").  (Pl.'s Stat. of Mat. Facts ¶ 8; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 8.)

    In connection with the shipment, Yang Ming issued Non-Negotiable Sea Waybill YMLUW260451242 ("the Sea Waybill") listing Yang Ming as "carrier" and Mitsubishi Logistics America Corporation ("MLAC") as the "consignee."[2]  (Pl.'s Stat. of Mat. Facts ¶¶ 8-9; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶¶ 8-9.)  The Sea Waybill indicated that Yang Ming as carrier would carry the container and its contents from "the place of receipt" to "the place of delivery, Memphis, TN CY."  (Pl.'s Stat. of Mat. Facts ¶ 9; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 9.)  The term "CY" is a standard shipping term which means that the shipper has delivered the cargo to the "container yard" designated by the ocean carrier at the location indicated. (Pl.'s Stat. of Mat. Facts ¶ 9; Def.'s Resp. to

_____

[2] Defendant Intermodal does not dispute that the Sea Waybill identifies the parties as indicated. Intermodal does add, however, that the "Through Bill of Lading" which it received from MLAC identifies Nippon as "the shipper" and "Nucor Steel-Hickman, Arkansas" as the "consignee." (Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 9.)

Pl.'s Stat. of Mat. Facts ¶ 9.)  The notation "CY" as it relates to the place of delivery is also a standard shipping term which means that the carrier will deliver the cargo to the bill of lading consignee or its nominated receiver at the container yard. (Pl.'s Stat. of Mat. Facts ¶ 9; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 9.)  In this case, according to the Sea Waybill, the containers were to be picked up at Nagoya, Japan, and delivered to the Burlington Northern container yard in Memphis, Tennessee.  (Pl.'s Stat. of Mat. Facts ¶ 9; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 9.)

Mitsubishi Logistics packed and sealed the containers delivering them into Yang Ming's possession at the Nagoya, Japan container yard.  (Pl.'s Stat. of Mat. Facts ¶ 10; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 10.)  The containers were then loaded onto the ocean freighter "Newport Bridge," and shipped from the container yard in Nagoya, Japan to Long Beach, California.  (Pl.'s Stat. of Mat. Facts ¶ 11; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 11.)  After arriving in Long Beach, the container was then shipped via Burlington Northern railways to the Burlington North Santa Fe ("Burlington Northern") container yard in Memphis, Tennessee.  (Pl.'s Stat. of Mat. Facts ¶ 11; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 11.)  Upon arrival at the Burlington Northern container yard in Memphis, the Sea Waybill indicates that the delivery status of the container was "Micro Bridge Ramp Service

4

(IPI)." (Pl.'s Stat. of Mat. Facts ¶ 11; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 11.) "IPI" means "Inland Point Intermodal." (Pl.'s Stat. of Mat. Facts ¶ 11; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 11.) No damage was found to the container during an inspection conducted by Burlington Northern upon the container's arrival at the container yard. (Pl.'s Stat. of Mat. Facts ¶ 17; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 17.)

On June 7, 2004, MLAC issued a Drayage Request to Intermodal asking Intermodal to handle the moving of the container from the Burlington Northern container yard in Memphis to a warehouse operated by Global Material Services ("Global") located on President's Island in Memphis, Tennessee. (Doc. 26-3, Def.'s Stat. of Mat. Facts ¶ 1; Doc. 41-2, Pl.'s Resp. to Stat. of Mat. Facts ¶ 1.) The Drayage Request instructed Intermodal to deliver the container to the Global warehouse to be unloaded, after which Intermodal was to pick up the container and return it to the Burlington Northern container yard with freight prepaid by MLAC. (Pl.'s Stat. of Mat. Facts ¶ 15; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 15.) To effectuate the exchange from MLAC to Intermodal, Yang Ming issued a Cargo Release on June 9, 2004, which authorized a local cartage company, in this case, Intermodal, to transport the container by truck to the site where it was to be unloaded and to then return the container to the

Burlington Northern container yard. (Pl.'s Stat. of Mat. Facts ¶ 16; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 16.)

Intermodal received the container on June 9, 2004, at the Burlington Northern container yard, with seal number 400208 intact. (Def.'s Stat. of Mat. Facts ¶ 6; Pl.'s Resp. to Stat. of Mat. Facts ¶ 6.) No damage was found relative to the container in question. (Def.'s Stat. of Mat. Facts ¶ 6; Pl.'s Resp. to Stat. of Mat. Facts ¶ 6.) Accordingly, after inspection of the container, Burlington Northern issued an "Outage Interchange Receipt" to Intermodal. (Pl.'s Stat. of Mat. Facts ¶ 17; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 17.) This receipt indicated that the "unit cannot return empty w/out waybill." (Pl.'s Stat. of Mat. Facts ¶ 20; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 20.) The Outage Interchange Receipt was an "equipment interchange receipt" as defined by the UIIA. (Pl.'s Stat. of Mat. Facts ¶ 21; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 21.)

Intermodal delivered the container to Global that same day in good order. (Def.'s Stat. of Mat. Facts ¶ 7; Pl.'s Resp. to Stat. of Mat. Facts ¶ 7.) The next day, June 10, 2004, Larry Miller, an employee of Global, suffered fatal injuries when he was unloading electrodes from Yang Ming's container. (Def.'s Stat. of Mat. Facts ¶ 14; Pl.'s Resp. to Stat. of Mat. Facts ¶ 14.) Intermodal was not in actual physical possession of the container at the time of the incident which led to Miller's death. (Def.'s Stat. of

6

Mat. Facts ¶ 8; Pl.'s Resp. to Stat. of Mat. Facts ¶ 8.)  At no time did Intermodal ever break the container's seal or check the contents of the container.  (Def.'s Stat. of Mat. Facts ¶ 10; Pl.'s Resp. to Stat. of Mat. Facts ¶ 10.)  Intermodal played no role in loading or unloading the container or securing its cargo, and the shipping documents together reflect that there was no problem, defect, or damage to the container during the period of time that Intermodal possessed the container.  (Def.'s Stat. of Mat. Facts ¶¶ 11-14; Pl.'s Resp. to Stat. of Mat. Facts ¶¶ 11-14.)

On June 18, 2004, Intermodal picked up the empty container and returned it to the Burlington Northern container yard.  (Pl.'s Stat. of Mat. Facts ¶ 24; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 24.)  Upon receipt of the container, Burlington Northern issued an "Ingate Interchange Receipt" to Intermodal.  (Pl.'s Stat. of Mat. Facts ¶ 25; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 25.)  This receipt reflected that Burlington Northern had inspected the container upon its return to the container yard and had found no damage.  (Pl.'s Stat. of Mat. Facts ¶ 25; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 25.)  The Ingate Interchange Receipt was also an "equipment interchange receipt" as defined by the UIIA.  (Pl.'s Stat. of Mat. Facts ¶ 26; Def.'s Resp. to Pl.'s Stat. of Mat. Facts ¶ 26.)

In order to facilitate interchange of equipment in situations commonly occurring in marine transport such as those set forth

7

above, Yang Ming and Intermodal both had contracted to participate in a version of the UIIA which was effective at all times relevant to this lawsuit. (Def.'s Stat. of Mat. Facts ¶ 16; Pl.'s Resp. to Stat. of Mat. Facts ¶ 16.)  At all times pertinent to the events at issue in this case, Yang Ming, Intermodal, and Burlington Northern were signatories to the UIIA.  (Doc. 28-1, Pl.'s Statement of Material Facts ¶¶ 1, 30; Doc. 42-2, Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 30.)  Neither MLAC nor Global were signatories to the UIIA at the time of the incident. (Pl.'s Statement of Material Facts ¶ 30; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 30.)

The UIIA is an industry contract between multiple intermodal truckers, drayage companies, and water and rail carriers which facilitates these companies in the business of shipping goods by reducing the amount of paperwork involved in complicated logistical transactions. (Pl.'s Statement of Material Facts ¶ 1; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 1.)  It is administered by the Intermodal Interchange Executive Committee, a Standing Committee of the Intermodal Association of North America ("IANA"). (Pl.'s Statement of Material Facts ¶ 30; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 30.)  To subscribe to the UIIA, all participants must execute agreements to be bound by its terms which are then accepted by an officer of the IANA at

headquarters in Maryland.[3]  (Pl.'s Statement of Material Facts ¶ 30; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 30.)  Yang Ming's and Intermodal's agreement to be bound by the UIIA was accepted by an authorized officer at the IANA headquarters in Maryland.  (Pl.'s Statement of Material Facts ¶ 30; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 30.)  The Agreement further states that all disputes between the parties over the terms or provisions of the UIIA will be governed by the laws of the state of Maryland.  (Comp. Ex. A at G.7.)

Section B of the UIIA includes specific definitions for a number of relevant terms.  (Compl. Ex. A § B.)  The relevant terms and their definitions are:

>4.    Equipment: Equipment commonly used in the road transport of intermodal freight including trailers, chassis, containers and associated devices.
>
>5.    Equipment Owner: The holder of beneficial title to the Equipment, regardless of the form of the title.
>
>6.    Equipment Interchange Receipt (EIR): A document setting forth the physical condition of the Equipment at the time of Interchange and executed by the Parties to this Agreement, or their agents.
>
>7.    Facility Operator: Party whose Premises are accessed for the purpose of effecting an interchange.
>
>9.    Interchange: The transfer of physical possession of Equipment under the Agreement.

---

[3]    The actual language of the UIIA provides that the "[agreement shall be binding upon all Parties, and of full force and effect, at the time of its signing by a duly authorized official of a Party and its acceptance by IANA." (Comp. Ex. A at H.)

10.  Interchange Period: The period, commencing upon Interchange to Motor Carrier and concluding upon Interchange to Provider.

11.  Motor Carrier: The Party being granted access to Provider's facilities and/or having physical possession of the Equipment for the purpose of road transport or its designated agent or contractor.

12.  Provider: The Party authorizing delivery and/or receipt of physical possession of Equipment with a Motor Carrier

13.  Parties: The Provider, Motor Carrier and/or Facility Operator who are signatories of this Agreement.

UIIA § B.  The parties agree that Burlington Northern's actions qualified it as a "Facility Operator" as it is defined in the UIIA.  (Pl.'s Statement of Material Facts ¶ 13; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 13.)  The parties further agree that the container constituted "Equipment" as that term is defined in the UIIA. (Pl.'s Statement of Material Facts ¶ 19; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 19.)

Section F of the UIIA, entitled "Liability, Indemnity, and Insurance" provides, in pertinent part:

3.  If the Equipment is interchanged by Motor Carrier or is otherwise authorized by Motor Carrier to be in the possession of other parties, the Motor Carrier shall be responsible for the performance of all terms of this Agreement in the same manner as if the Equipment were in the possession of the Motor Carrier, unless the written consent of the Provider has been obtained.

4.  Indemnity: MOTOR CARRIER AGREES TO DEFEND, HOLD HARMLESS AND FULLY INDEMNIFY THE INDEMNITEES, AGAINST ANY AND ALL CLAIMS, SUITS, LOSS, DAMAGE OR LIABILITY, FOR BODILY INJURY, DEATH AND/OR PROPERTY DAMAGE (INCLUDING REASONABLE ATTORNEY FEES AND

10

COSTS   INCURRED   IN   THE   ENFORCEMENT   OF   THIS
AGREEMENT) ARISING OUT OF OR RELATED TO THE MOTOR
CARRIER'S: USE OR MAINTENANCE OF THE EQUIPMENT
DURING AN INTERCHANGE PERIOD; THE PERFORMANCE OF
THIS AGREEMENT; AND/OR PRESENCE ON THE FACILITY
OPERATOR'S PREMISES.

. . .

6.   Insurance: To the extent permitted by law, Motor
Carrier   shall   provide   the   following   insurance
coverages in fulfillment of its legal liability and
obligations contained in this Agreement:

a.   A commercial automobile liability policy . . .
insuring all Equipment involved in Interchange
. . . ; said insurance policy shall name the
Equipment Provider as additional insured.

b.   A commercial general liability policy;

c.   Motor   Carrier   shall   have   in   effect,   and
attached   to   its   commercial   automobile
liability   policy,   a   Truckers   Uniform
Intermodal   Interchange   Endorsement   (UIIE-1)
which   includes   the   coverages   specified   in
Section F.4.

(Compl. Ex. A § F.)   The endorsement mentioned in subsection

F.6.c. states in relevant part as follows:

Section II - Liability Coverage, Paragraph A. Coverage,
Subparagraph 1.  Who is an insured is changed to include
as an "insured" the person or organization shown in the
SCHEDULE on this endorsement only if they are liable for
the conduct of an "insured" shown in the Who is an
Insured provisions and only to the extent of that
liability.

Coverage   provided   by   this   endorsement   applies   to
"auto(s)" described in the SCHEDULE on this endorsement.

The coverage provided by this endorsement ends when the
Additional Insured is not liable for your conduct or the
Policy Expiration date, whichever occurs first.

(Comp. Ex. B at 1.)   In accordance with the UIIA, Intermodal was the named insured of an insurance policy issued by Great West Casualty Company, which listed Yang Ming as an additional insured of the policy. (Def.'s Stat. of Mat. Facts ¶¶ 17-19; Pl.'s Resp. to Stat. of Mat. Facts ¶¶ 17-19.)

Because of the incident, Larry Miller's widow, Vickie Miller, filed the underlying *Miller* lawsuit for the wrongful death of Larry Miller against several defendants, including Yang Ming. (Pl.'s Statement of Material Facts ¶ 32; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 32.)   Intermodal was not named as a defendant in the *Miller* lawsuit.   (Def.'s Stat. of Mat. Facts ¶ 22; Pl.'s Resp. to Stat. of Mat. Facts ¶ 22.)   Yang Ming was ultimately dismissed from the lawsuit.   (Pl.'s Statement of Material Facts ¶ 40; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 40.) Nevertheless, Yang Ming incurred approximately $93,573.72 in attorney fees and costs defending the action. (Pl.'s Statement of Material Facts ¶ 41; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 41.)

The complaint in the *Miller* action alleged that the "container was transported by defendant Yang Ming by ocean freighter from Nogoya, Japan to Long Beach, California and by rail and by truck to President's Island" and that it "arrived in Memphis damaged and in an extremely dangerous condition." (Doc. 26-4, ¶ 5.)   It further alleged that "Mitsubishi and/or Mitsubishi

America were primarily responsible for the loading and packing;" that "Yang Ming was responsible as carrier to inspect the load and had the opportunities to inspect the load;" and that Yang Ming also had a duty to exercise due care to handle the load properly in transit and not to mishandle said container." (Doc. 26-4, ¶ 7.)  For cause of action, the complaint alleged that Yang Ming was guilty of common law negligence due to its failure (1)"to exercise reasonable and ordinary care under the circumstances;" (2)"to inspect the said cargo prior to delivery," which inspection would have revealed the dangerous condition of the cargo; and (3)"to warn plaintiff's decedent or others charged with the responsibility of unloading the dangerous cargo of the dangers involved." (Doc. 26-4, ¶ 9.)

Pursuant to the UIIA, Yang Ming notified Intermodal of Miller's wrongful death action and requested that Intermodal provide a defense.  (Pl.'s Statement of Material Facts ¶ 35; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 35.) Intermodal declined to provide that defense. (Pl.'s Statement of Material Facts ¶ 38; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 38.)  Accordingly, Yang Ming provided its own defense in the *Miller* lawsuit, and, in the instant lawsuit, seeks to recover its defense costs from Intermodal pursuant to the terms of the UIIA.  (Pl.'s Statement of Material Facts ¶ 41; Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 41.)

The UIIA also contains provisions which govern the notice
that indemnified parties are to give the Motor Carrier in the
event of a claim.  (Compl. Ex. A § F.5.)  Neither party disputes
that Yang Ming properly complied with all such requirements when
tendering its defense in the *Miller* action to Intermodal.  (Pl.'s
Statement of Material Facts ¶¶ 35-37; Def.'s Resp. to Pl.'s
Statement of Material Facts ¶¶ 35-37.)

### II. ANALYSIS

The following issues are in dispute in these cross motions
for partial summary judgment: (1) whether the law of Maryland or
Tennessee should control the interpretation of the parties'
agreement; (2) whether the incident occurred during an
"Interchange Period" as defined by the UIIA; (3) whether the
circumstances that gave rise to the underlying *Miller* action
"[arose] out of or [were] related to" Intermodal's "use" of the
container; and (4) whether the UIIA requires Intermodal to defend
and indemnify Yang Ming, specifically for its own negligence.

A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure,
summary judgment is proper "if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law."  FED. R. CIV. P. 56(c); *see also LaPointe v.*

14

*United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact at issue in the case. *LaPointe,* 8 F.3d at 378. This may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

In response, the nonmoving party must go beyond the pleadings and present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also LaPointe*, 8 F.3d at 378. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247—48 (1986)(emphasis in original); *LaPointe*, 8 F.3d at 378.

In deciding a motion for summary judgment, "this [c]ourt must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*,

8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251—52).   The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.   *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Patton*, 8 F.3d at 346; *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).   However, to defeat a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."   *Anderson*, 477 U.S. at 252; *LaPointe*, 8 F.3d at 378.   Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.   *Anderson*, 477 U.S. at 255; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

Cross-motions for summary judgment do not guarantee entry of summary judgment for one of the movants.   Each motion must be considered on its own merits, and both may be denied.   *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

B.   <u>Choice of Law</u>

Yang Ming contends that this court should apply Maryland law to construe the provisions of the UIIA.   Intermodal contends that the law of Tennessee should be applied.   A federal court exercising its diversity jurisdiction must apply the choice-of-law

rules of the state in which it is located. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941). In resolving contractual disputes in the absence of an enforceable choice-of-law provision, Tennessee adheres to the rule of *lex loci contractus*. Thus, when the dispute involves questions concerning rights and obligations under a contract, the court applies the law of the state where the contract was made, absent a contrary intent. *See Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973).

As a general rule, courts will honor a contractual choice-of-law provision, so long as it meets certain requirements. *See Credit General Ins. Co. v. Insurance Service Group, Inc.*, No. E2007-00033-COA-R3-CV, 2007 Tenn. App. LEXIS 495, 2007 WL 2198475 at *2 (Tenn. Ct. App., Jul. 31, 2007) (citing *Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980)). First, the choice-of-law provision must be executed in good faith. *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 475 (Tenn. Ct. App. 2003) (citing *Goodwin Bros.*, 597 S.W.2d at 306). Second, the jurisdiction whose law is to govern must bear a material connection to the parties' business. *Goodwin Bros*, 597 S.W.2d at 306. Third, the parties' choice of law must be reasonable and not merely a sham or subterfuge. *Id.* Finally, the law of the jurisdiction of the parties' choosing must not be "contrary to 'a fundamental policy' of a state [which possesses]

17

'a materially greater interest' and whose law would otherwise govern." *Id.*, n.2 (citing Restatement (Second) of Conflict of Laws § 187(a)(2)(1971)).

The parties agree that the choice-of-law provision was executed in good faith and was not merely a sham or subterfuge. Intermodal, however, contends that the state of Maryland bears no material connection to the transaction at hand because neither of the parties had any place of business there and no part of the parties' business occurred within its borders. Intermodal also argues that enforcement of the UIIA's choice-of-law provision would violate Tennessee public policy by recognizing a duty to defend or indemnify a party for its own negligence where such duty was not clearly and unequivocally embodied within the agreement.

Yang Ming counters that Maryland's material connection to the transaction is demonstrated by the language of the UIIA and that honoring this language provides the certainty and predictability the parties sought to obtain by including the choice-of-law provision in their agreement. Yang Ming further contends that the language of the parties' agreement clearly reflects Intermodal's obligation to defend Yang Ming against Yang Ming's own negligence and that such an agreement is consistent with the public policy of both Maryland and Tennessee.

18

1.   Material Connection

To support its position that Maryland bears no material connection to the transaction at hand, Intermodal points to the fact that neither it nor Yang Ming are Maryland businesses, that the container was located in Tennessee at the time of the accident which gave rise to the underlying complaint, and that the UIIA was executed and performed in Tennessee.  Yang Ming argues that Maryland is the state where the parties executed the UIIA and that the material connection between the agreement and the transaction exists because the Intermodal Association of North America ("IANA") administers the agreement from and according to the laws of the state of Maryland.

The transaction with which the court is presently concerned is the parties' agreement to be bound by the terms of the UIIA, which governs the rights and obligations flowing between Intermodal and Yang Ming, and not the transport or actual movement of the container from Nagoya, Japan to Memphis, Tennessee.  The UIIA is administered by the Intermodal Interchange Executive Committee ("IIEC"), a subdivision of the IANA, which has its principal place of business in Maryland.  As part of its administrative duties, the IIEC collects information from the motor carriers who are signatories of the UIIA at its Maryland office and then disseminates that information to equipment provider signatories in an effort to lessen the amount of

paperwork necessary for those companies to do business with one another. Essentially, the IIEC, through its administration of the UIIA, provides a clearing house for motor carriers and equipment providers who agree to be bound by the terms of the UIIA. The IIEC provides this service from its location in Maryland and it was through this service that Intermodal was able to do business with Yang Ming. In addition, it is undisputed that Yang Ming's and Intermodal's agreement to participate in the UIIA was accepted by an authorized officer at the IANA headquarter in Maryland at which time the agreement became effective. Thus, the agreement was executed in Maryland. Maryland, therefore, bears a material connection to the transaction between the parties.

The court finds little merit in Intermodal's argument concerning this prong of the analysis. The underlying complaint alleged negligence in not only the transportation and inspection of the container, but also in the loading of the container. The loading of the container took place solely in Japan. The container itself traveled across the Pacific Ocean and multiple states before reaching Memphis, Tennessee, where the Miller accident ultimately occurred. Therefore, it would be difficult to find that Tennessee bore a closer relation to the "transaction" than any number of other forums even if the court were to look to Intermodal's interpretation and consider the movement of the container as the actual transaction at issue.

2.    Public Policy

Intermodal contends that applying Maryland law to determine the parties' obligations under the UIIA would violate Tennessee's public policy concerning indemnification for one's own negligence. The court disagrees.

"The public policy of Tennessee is to be found in its constitution, statutes, judicial decisions and applicable rules of common law." *Crawford v. Buckner*, 839 S.W.2d 754, 759 (Tenn. 1992) (internal citations omitted).  Tennessee's public policy is primarily determined by the legislature. *Hyde v. Hyde*, 562 S.W.2d 194, 196 (Tenn. 1978).    Courts will make public policy determinations only in the absence of any constitutional provision or statute which governs the subject matter at hand.  *Crawford*, 839 S.W.2d at 759 (citing *Cavender v. Hewitt*, 145 Tenn. 471, 475, 239 S.W. 767, 768 (1921)).

The Tennessee General Assembly recently, in 2008, passed legislation pertaining directly to the issue currently before the court.  The language of the statute reads as follows:

(a)  A covenant, promise, agreement or understanding in or in connection with or collateral to a motor carrier transportation contract purporting to indemnify the promisee against liability for damages resulting from the negligence of the promisee, the promisee's agents or employees, or indemnitee, is against public policy and is void and unenforceable.

(b)  Subsection (a) shall not apply to the Uniform Intermodal Interchange and Facilities Access Agreement ["UIIA"] administered by the Intermodal Association of North America or other agreements providing for the

interchange, use or possession of intermodal chassis, containers or other intermodal equipment.

2008 TENN. PUB. ACTS 636, § 1, *codified as amended at* TENN. CODE ANN. § 65-15-108 (2009).  While this provision alone would seem to negate Intermodal's public policy argument, Intermodal argues that the court should not apply this statute to the version of the UIIA at issue in this case because doing so would have an impermissible retroactive effect and that the court should apply the law in effect at the time.[4]  Because of the state of the law prior to the

---

[6]    Intermodal notes that the UIIA was altered in 2005, and currently reads, in pertinent part:

> Subject to the exceptions set forth in Subsection (b) . . . Motor Carrier agrees to defend, hold harmless, and fully indemnify the Indemnitees *(without regard to whether the Indemnitees' liability is vicarious, implied in law, or as a result of the fault or negligence of the Indemnitees)*, against any and all claims, suits, loss, damage or liability for bodily injury, death and/or property damage, including reasonable attorney fees and costs incurred in the defense against a claim or suit, or incurred because of the wrongful failure to defend against a claim or suit, or in enforcing subsection F.4 (collectively, the "Damages"), caused by or resulting from the Motor Carrier's use or maintenance of the Equipment during an Interchange Period.

*See Sitek v. J. Cerna Trucking, Inc.*, No. 3:06-CV-138 RM, 2009 WL 62435, at *2 (N.D. Ind. Mar. 9, 2009)(emphasis added). Intermodal argues in its reply memorandum that the Tennessee General Assembly excepted the UIIA from its prohibition of such indemnity agreements based on the UIIA's revised language and not the previous version which governs the parties' relationship here. (Doc. 50, Def.'s Reply Mem. at 23.)  Intermodal argues that applying the statute to this litigation would have an "impermissible retroactive effect." (*Id.*) (citing *BellSouth Telecomm., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 657 (6th Cir. 2006).

As noted above, the court sees no merit in this argument. The

22

General Assembly's amendment of the relevant code provision, the court finds Intermodal's public policy argument to be without merit.

Prior to the passage of § 65-15-108, Tennessee courts repeatedly held that it was not against the state's public policy to uphold agreements purporting to indemnify an indemnitee for the indemnitee's own negligence. *See Kellog Co. v. Sanitors, Inc.*, 496 S.W.2d 472, 473 (Tenn. 1973) ("[W]e [have] held it was not against public policy to contract to be indemnified against one's own negligence . . . ." (citing *Kroger Co. v. Giem*, 215 Tenn. 459, 387 S.W.2d 620 (1964))); *Phoenix Ins. Co. v. Gainer*, No. M2007-01446-COA-R3-CV, 2008 Tenn. App. LEXIS 748, at *21 (Tenn. Ct. App. Dec. 19, 2008) (holding that such agreements are not against public policy). *See also, McClain v. Illinois Central Gulf RR.*, No. 02A01-9103-CV-00041, 1991 Tenn. App. LEXIS, at *11 (Tenn. Ct. App. Oct. 2, 1991)(same); *Power Equipment Co. v. J.A. Jones Const. Co.*, No. 844, 1989 Tenn. App. LEXIS 861, at *4-5 (Tenn. Ct. App.

---

*prohibition* contained in the statute represents a change in the state's public policy, which up until the passage of § 65-15-108, permitted such agreements so long as they were spelled out in "unequivocal terms." *Kroger Co. v. Giem*, 215 Tenn. 459, 387 S.W.2d 620 (1964). In addition, the language of the statute does not mention any certain version of the UIIA as the basis for its exclusion from the prohibition. The court will therefore not read a limitation into the statute that the legislature did not see fit to include. *See Nixon v. Kent County*, 76 F.3d 1381, 1386 (6th Cir. 1996) ("[I]f the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, the language must ordinarily be regarded as conclusive." (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 176 (1993))).

23

Feb. 10, 1989)(same).  Regardless of whether the statute is applied or not, such an indemnity provision in the UIIA does not violate the public policy of Tennessee.

In the absence of a public policy prohibition, the court must defer to the parties' agreement and interpret the contract according to the laws of state by the which the parties have chosen to be bound. *See Johnson v. Ventura Group, Inc.*, 191 F.3d 732, 740 (6th Cir. 1999) (finding that "the fact . . . that a different result might be achieved [by applying the law of the chosen forum] does not suffice to show that the foreign law is repugnant to a fundamental policy of the forum state"). Therefore, the court will apply the law of Maryland to interpret the relevant provisions of the UIIA.

C.    Duty to Defend

Intermodal contends that the indemnity provision of the UIIA does not require it to defend Yang Ming because (1) the Miller incident did not occur during an Interchange Period when Intermodal had possession of the container; (2) the Miller incident did not "[arise] out of or related to" Intermodal's "use" of the container; and (3) the indemnity provision does not provide for indemnification of Yang Ming for its own negligence.

Because the underlying *Miller* action did not result in a damages award against Yang Ming or a monetary settlement by Yang Ming, the issue presently before the court is whether Intermodal

24

had a duty to defend Yang Ming against the allegations in the *Miller* case, not a duty to indemnify Yang Ming. The duty to defend is conceptually different from the duty to indemnify. *Walk v. Hartford*, 852 A.2d 98, 106 (Md. 2004). The duty to defend depends only on the facts alleged in the underlying complaint while the duty to indemnify depends upon a factual finding of liability. *Id.* (citing *Litz v. State Farm*, 695 A.2d 566, 570 (Md. 1997)). Courts interpret the duty to defend more broadly than the duty to indemnify. *Id.* (citing *Litz*, 695 A.2d at 659).

1.   During an "Interchange Period"

Section F.4. of the UIIA requires Intermodal to defend or indemnify Yang Ming for losses "arising out of or related to [Intermodal's] use or maintenance of the equipment during an Interchange Period." In order to determine whether the allegations in the *Miller* complaint of Yang Ming's negligence triggered Intermodal's duty to defend under the UIIA, the court must first determine whether the loss occurred during an "Interchange Period" under the UIIA. When interpreting insurance contracts, courts are to give words "their 'customary, ordinary and accepted meaning' unless there is an indication that the parties intended to use the words in a technical sense." *Bushey v. N. Assurance Co. of Am.*, 766 A.2d 598, 600 (Md. 2001). "The 'ordinary' meaning of a word is properly tested by 'what a reasonably prudent lay person would attach to them.'" *Beale v. Am.*

*Nat'l Lawyers Ins. Reciprocal*, 843 A.2d 78, 89 (Md. 2004) (quoting *Bushey*, 766 A.2d at 600).

As previously noted, Section B of the UIIA contains definitions of several terms which are commonly used in business of exchanging intermodal equipment. Section B(9) defines "Interchange" as "[t]he transfer of physical possession of Equipment under the Agreement. Section B(10) defines "Interchange Period" as "[t]"he period, commencing upon Interchange to Motor Carrier and concluding upon Interchange to Provider." Section B(11) defines "Motor Carrier" as [t]he Party being granted access to Provider's facilities and/or having physical possession of the Equipment for the purpose of road transport or its designated agent or contractor. Section B (12) defines "Provider" as "[t]he Party authorizing delivery and/or receipt of physical possession of Equipment with a Motor Carrier." And, finally, Section B(13) defines Parties as "The Provider, Motor Carrier and/or Facility Operator who are signatories of this Agreement." The court finds, as a matter of law, that pursuant to the definitions in Section B of the UIIA, Yang Ming qualified as a "Provider" of the container during all times relevant to this litigation.[5] The court also finds that Intermodal was a "Motor Carrier" in its handling of the container.

---

[5] Yang Ming also qualified as an Equipment Owner under the UIIA.  Section B(5) defines "Equipment Owner" as [t]he holder of beneficial title to the Equipment."

Intermodal contends that the incident in the underlying *Miller* complaint could not trigger its contractual duty to defend or indemnify because it was not in physical possession of the container at the time the incident occurred. Intermodal contends its "Interchange Period" ended when it transferred possession of the container to Global, who was in possession of the container when the accident occurred. Conversely, Yang Ming asserts that Intermodal's contractual duty to defend remained attached because Intermodal had not Interchanged the container back to Yang Ming or any other Provider as defined by the UIIA at the time of the *Miller* incident. In other words, Yang Ming contends the Interchange Period with Intermodal commenced upon Intermodal taking physical possession of the container from Yang Ming at the Burlington Northern container yard and continued until Intermodal transferred physical possession of the container back to Yang Ming at the Burlington Northern container yard.

The Middle District of Pennsylvania addressed the duration of the "Interchange Period" under the UIIA in the case of *Phillips-Van Heusen Corp. v. Mitsui O.S.K. Lines Ltd.*, No. 1:CV-00-0665, 2002 U.S. Dist. LEXIS 27057, 2002 WL 32348263 (M.D. Pa. Aug. 14, 2002). In that case, two companies, Maersk Line, Inc. ("Maersk") and Mitsui O.S.K. Lines, Ltd. ("Mitsui") contracted with Kellaway Transportation, Inc. ("Kellaway") to transport the companies' containers from New Jersey to Harrisburg, Pennsylvania, where,

27

after clearing customs in Harrisburg, Kellaway would transfer possession of the containers to GPS Transport ("GPS") who would transport the containers from Harrisburg to a warehouse located in Reading, Pennsylvania. *Id.*, 2002 U.S. Dist. LEXIS 27057, at *10. Maersk, Mitsui and Kellaway were parties to the UIIA at all times relevant to the case. *Id.* at *44. On two separate days, June 15, 1999, and June 17, 1999, Kellaway employees picked up the Maersk and Mitsui containers and delivered them to the Kellaway facility in Harrisburg for holding. *Id.* at *10-11. On both occasions, a Kellaway employee issued an "interchange equipment receipt" which, among other things, chronicled the condition of each container at the time that they were delivered to the Harrisburg facility. The containers were left at Kellaway's Harrisburg facility over the weekend of June 18-20, 1999, during which time, several of the containers were either broken into or stolen outright. *Id.* at *11-12. Phillips-Van Huesen Corporation, to whom the contents of the containers were eventually to be delivered, filed suit against Maersk and Mitsui who tendered their defense to Kellaway. *Id.* at *13. Kellaway refused the defense. *Id.*

Kellaway argued that the indemnification provisions of the UIIA did not apply to it once it delivered the containers to its Harrisburg facility because that delivery marked the end of the "interchange period" under the UIIA. *Id.* at *43. To support its contention, Kellaway pointed to its issuance of an interchange

equipment receipt each time it delivered a container to its
Harrisburg lot. *Id.* at 45. In finding Kellaway's arguments
meritless, the court emphasized that the "interchange period,"
during which the motor carrier will be liable to a provider,
commences upon the motor carrier taking physical possession of the
equipment and lasts until the motor carrier transfers physical
possession of the equipment back to the provider. *Id.* The court
took note that the UIIA is "entirely silent as to the effect that
the issuing of an [interchange receipt] will have on the shifting
of the risk of loss. *Id.* at 46. In the absence of a such a
provision, the court relied on the UIIA's explicit requirement
that the motor carrier transfer physical possession back to the
provider to end the motor carrier's period of liability. *Id.*

Here, the parties agree that Intermodal transferred physical
possession of the container to Global prior to the *Miller*
incident. The parties disagree, however, as to whether that
transfer constituted an "Interchange" under the UIIA. Intermodal
insists that the transfer of the container to Global ended one
Interchange period and started another one.

As noted above, to effect an "Interchange" under the UIIA,
one must physically transfer the equipment "under the Agreement."
In addition, the definition of "Interchange Period" specifically
limits the parties involved in the Interchange to only a
"Provider" or a "Motor Carrier." To be a Provider under the

29

Agreement, one must also be a Party to the Agreement.   While "Party" in the singular is not defined in the UIIA, the term "Parties" in the plural is defined as a "Provider" who is a signatory of the UIIA.   A reasonably prudent lay person would find that the ordinary meaning of the term "Party" under the UIIA was the singular of the defined term "Parties."   The court so finds. Thus, the definitions, when read together, limit Interchanges to only those exchanges of equipment which occur between signatories to the UIIA.

Both parties agree that Global was not a signatory to the UIIA at any time pertinent to this lawsuit.   Because Global was not a signatory to the UIIA, Global was not a Party, and thus was not a Provider.   Therefore, under this construction of the UIIA, Intermodal could not "Interchange" the container to Global and thereby end the contractual "Interchange Period" during which it remained obligated to defend or indemnify Yang Ming.

In addition, Section F.3. of the UIIA, provides:

> If the Equipment is interchanged by Motor Carrier or is otherwise authorized by Motor Carrier to be in the possession of other parties, the Motor Carrier shall be responsible for the performance of all terms of this Agreement in the same manner as if the Equipment were in the possession of the Motor Carrier, unless the *written consent of Provider has been obtained*.

UIIA § F.3. (emphasis added).   This provision requires the Motor Carrier to obtain the Provider's written consent allowing the Motor Carrier to release the Provider's Equipment to a designated third

party who is not a Provider under the UIIA in order to relieve the Motor Carrier of liability for losses occurring during the period of release.  Put another way, the Provider must agree in writing that the Motor Carrier may release the equipment to a non-UIIA signatory and also agree specifically to release the Motor Carrier from liability to activate the last clause of § F.3.

Intermodal contends it had express written consent to interchange the container to Global because MLAC was acting as Yang Ming's agent when it directed and approved the transfer of the container to Global.  The burden is on the moving party to support its motion by affidavit or other proof.  The only proof offered by Intermodal for this position is the declaration of Lynn Parrish, which contains no such proof.  The record is devoid of any evidence of written consent by Yang Ming or an agency relationship between MLAC and Yang Ming, and the burden is on Intermodal to come forward with such proof.  Because Intermodal obtained no such release from Yang Ming before delivering the container to Global, the Interchange Period continued after Intermodal delivered the container to Global on June 9, 2004.

Indeed, Intermodal's own Freight Bill described the work performed by Intermodal related to the container as "round-trip service." (Pl.'s Statement of Material Facts ¶ 29; Def.'s Resp. To Pl.'s Statement of Material Facts ¶ 29.)  This notation indicates that the company recognized that it was responsible for exchanging

the container at the same spot, the Burlington Northern container yard. Consequently, the Interchange Period continued, and Intermodal remained liable under § F.4. for any loss arising out of its continued use of the container until such time as it returned physical possession of the container to the Provider as defined by the UIIA, in this case, Yang Ming.

 2. "Arising out of or Related to" Intermodal's "Use"

 In order to determine whether the allegations in the *Miller* complaint triggered Intermodal's duty to defend under the UIIA, the court must also determine whether the loss "[arose] out of or related to" Intermodal's use of Yang Ming's equipment. Maryland courts interpreting the phrase "arising out of" have afforded the words "their common understanding, namely, to mean originating from, growing out of, flowing from, or the like." *Mass Transit*, 708 A.2d at 305 (citing *N. Assurance Co. of Am. v. EDP Floors, Inc.*, 533 A.2d 688 (Md. 1987)). Maryland courts also find support for this interpretation in secondary sources. *See, e.g.*, 6B J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 4317, at 360-63 (R.B. Buckley ed., 1979) (noting that in the context of automobile insurance, the words "arising out of" have "broader significance that the words 'caused by', and are ordinarily understood to mean originating from, incident to, or having connection with the use of the vehicle"). Other federal courts interpreting the "arising out of" language according to Maryland

law have afforded the phrase such a broad interpretation.  *See Lopez v. Louro*, 2002 U.S. Dist LEXIS 1020, at *3-4.

The term "related to" is "defined more broadly and is not necessarily tied to the concept of a causal connection." *Coregis Ins. Co. v. Am. Health Found.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (Sotomayor, J.) (applying Ohio and Connecticut law).  "Courts have . . . described the term 'relating to" as equivalent with the phrases 'in connection with' and 'associated with,' and synonymous with the phrases 'with respect to,' and 'with reference to,' and have held such phases to be broader in scope than the term 'arising out of.'" *Id.* at 129 (internal citations omitted).  In addition, Black's Law Dictionary defines the term "use" as "to avail oneself of; to employ; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end." *Black's Law Dictionary* 1541 (6th ed. 1990).

Applying these interpretations to the language contained in § F.4. of the UIIA, the court finds that the *Miller* incident arose out of Intermodal's use of the container provided by Yang Ming during the Interchange Period.  Intermodal availed itself of the container and put the container into action for its own benefit: the benefit of moving the container for the contract price.  A direct causal relationship exists between the allegations in the *Miller* action and Intermodal's "use" of the equipment in that the

33

container was on Global's lot to be unloaded because of Intermodal's actions in delivering it there temporarily.

    3.    Duty to Defend Yang Ming for Claims in the *Miller* Complaint and for Yang Ming's Own Negligence

Courts in Maryland engage in a two-part inquiry to determine whether one party's duty to defend the other has arisen under the parties' contractual agreement. *Walk,* 852 A.2d 98 at 106 (Md. 2004). Courts examine the following:

> (1) what is the coverage and what are the defenses under the terms and requirements of the [agreement]? (2) do the allegations in the [underlying action] potentially bring the tort claim within the policy's coverage?

*St. Paul Fire & Mar. Ins. v. Pryeski*, 438 A.2d 282, 285 (Md. 1981). The obligation to defend arises as to all claims that may *potentially* be covered under the parties' agreement. *Walk*, 852 A.2d at 106 (emphasis added). The insured may establish the potentiality of coverage under the agreement through extrinsic evidence by demonstrating the existence of "a reasonable potential that the issue triggering coverage will be generated at trial." *Id.* (citing *Aetna Cas. & Sur. Co. v. Cochran*, 651 A.2d 859, 866 (Md. 1995)). But, the insured may only turn to extrinsic evidence if the underlying complaint "neither conclusively establishes nor negates a potentiality of coverage." *Walk*, 852 A.2d at 106 (citing *Cochran*, 651 A.2d at 864). Courts resolve all doubts concerning whether the underlying complaint triggers the duty to defend in favor of the insured. *Walk*, 852 A.2d at 106-07. These rules have

34

been applied not only to insurance companies but also to parties owing a contractual duty to defend. *See, e.g., Alpha Constr. & Eng'g Corp. v. Ins. Co. of the State of Pa.*, 601 F.Supp.2d 684, 692 (Md. 2009) (applying same rules to contractual duty to defend and indemnify).

The parties disagree as to whether the allegations in the *Miller* complaint are potentially covered by Intermodal's duty to defend Yang Ming. Yang Ming, among others, was named as a defendant in the *Miller* complaint. Intermodal was not. The complaint in the *Miller* action alleged that the "container was transported by defendant Yang Ming by ocean freighter from Nogoya, Japan to Long Beach, California and by rail and by truck to President's Island." Intermodal, however, transported the container by truck to President's Island; Yang Ming did not. Thus, the factual allegations in the *Miller* complaint encompass the period of time in which Intermodal transported the container and was in exclusive control of the container.

In addition, two of the various theories of negligence set forth in the *Miller* complaint potentially include acts of negligence during segments of the transportation of the container when the container was in the possession of Intermodal. The *Miller* complaint alleges failure to properly load and pack the contents of the container as a theory of negligence but the factual allegations state that Mitsubishi and, in the amended complaint, Morohoshi, not

Yang Ming, were responsible for packing and loading. The *Miller* complaint also alleges negligence based on failure to inspect and failure to warn. Both of these theories of negligence potentially encompass a portion of the time when Intermodal had possession of the container. Although the *Miller* complaint alleged the container arrived in Memphis in a damaged and dangerous condition, the duty to inspect and the duty to warn did not end upon the arrival of the container in Memphis. The duty to inspect and warn continued with each carrier who transported and delivered the vehicle to Global. The court finds, therefore, that even though Intermodal was not named as a defendant in the *Miller* lawsuit, the factual allegations and theories of negligence in the underlying *Miller* complaint potentially encompassed negligence on the part of Intermodal and triggered Intermodal's duty to defend under the provisions of the UIIA.[6]

Having found that the factual allegations in the *Miller* complaint potentially encompassed negligence on the part of

---

[6] Because the court finds the underlying complaint in the *Miller* lawsuit in this district establishes a potentiality of coverage, the court need not consider the complaint in the *Miller* lawsuit filed in Arkansas in which Intermodal was named as a defendant and which contained the same or similar allegations of negligence against Intermodal as were claimed against Yang Ming in the *Miller* lawsuit in this district. The fact that Intermodal was exonerated in the Arkansas lawsuit would be of no effect in determining potentiality of coverage. The duty defend does not depend on liability; only the duty to indemnify depends on liability. Indeed, Yang Ming was likewise exonerated in the *Miller* action in this district.

Intermodal, the court need not but will nevertheless determine whether Intermodal would be obligated to defend Yang Ming based solely on allegations of Yang Ming's own negligence.  In Maryland, the general rule is that a contract will not be construed to indemnify a person against his own negligence unless an intention to do so is expressed in those very words or other unequivocal terms. *Mass Transit Admin. v. CSX Transp., Inc.*, 708 A.2d 298, 308 (Md. 1998) (quoting *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 578 A.2d 1202, 1206-07 (Md. 1990)).  The general rule, however, does not apply to an insurance contract.  *Mass Transit*, 708 A.2d at 308 (quoting *Heat & Power*, 578 A.2d at 1208).

Other courts who have analyzed similar questions of defense and indemnity arising under the UIIA have found the UIIA to be in essence an insurance contract to which the general rule that contracts will not be construed to indemnify a person against his own negligence unless expressed in unequivocal terms does not apply. *See CMA-CGM (America) Inc. v. Empire Truck Lines Inc.*, 285 S.W.3d 9, 15 (Tex. Ct. App. 2008) *reh'g den.* 2009 Tex. App. LEXIS 1316 (Tex. App. Houston 1st Dist., Feb. 26, 2009) (finding the UIIA enforceable as an insurance contract); *Sitek*, 2009 WL 62435 at *4 (quoting *NYK Line Inc. v. P. B. Indus., Inc.*, TH 02-0074-C-T/H, 2004 U.S. Dist. LEXIS 13956, at *12-13 (S.D. Ind., Apr. 20, 2004) for the proposition that the UIIA is essentially an insurance contract and should be construed as such).

37

Interpreting the indemnity portion of the UIIA, the district court for the Southern District of Indiana stated in *NYK Line*:

> [A]lthough the [UIIA] is not an insurance contract or policy, *per se*, it is an agreement pursuant to which PBI agreed to indemnify NYK, defend NYK, and procure insurance which would include NYK as an additional insured for claims, suits, losses, damages or liabilities for bodily injury or death arising out of PBI's use of the chassis or container owned by NYK.  These obligations and the terms of art invoked therein are typically part of an insurance contract with an insurance company. Accordingly, the scope of the various obligations has been examined and interpreted by courts and agencies as a part of the body of "insurance law". [sic]  Therefore, reference to decisions involving these same obligations as they arise in insurance policies is appropriate, as the clear intent of Section F of the [UIIA] is to sort through the insurance related obligations of the signatories.  Indeed, Section F is titled "Liability, Indemnity and Insurance" and as provider of the indemnity, short of passing that obligation off to an insurance company, PBI is for all practical purposes an insurer and NYK the insured.

*NYK Line Inc.*, TH 02-0074-C-T/H, 2004 U.S. Dist. LEXIS 13956, at *12-13.

Both parties rely on *Mass Transit Administration v. CSX Transportation, Inc.*, 708 A.2d 298 (Md. 1998) in support of their positions.  In *Mass Transit*, Maryland's highest court analyzed an indemnity provision similar to the one at issue here.  708 at 302-04.  The Maryland Mass Transit Administration ("MTA") contracted with CSX Transportation, Inc. ("CSXT") to allow CSXT to provide daily rail service between Baltimore, Maryland and Washington, DC. *Id.* at 299-300.  The specific contractual language before the court in *Mass Transit* provided, in pertinent part:

(b) Indemnification by [MTA]

> (1) [MTA] agrees to indemnify, save harmless, and
> defend [CSXT] from any and all casualty losses, claims,
> suits, damages, or liability of every kind arising out of
> the Contract Service under this Agreement, up to a
> maximum amount of One Hundred Fifty Million Dollars ($
> 150,000,000), per occurrence, during the term of this
> Agreement, as excepted or limited by the terms of
> subsections (a), (c), (d), and (e), infra. This maximun
> indemnification amount shall include any expenses for
> outside manpower, for legal representation and for other
> extraordinary expenses of handling individual claims for
> [MTA] . . . .

*Id.* at 300.  In addition, MTA self-insured "Five Million Dollars

($5,000,000) per occurrence of any casualty claim or loss for which

it is responsible" under the parties' agreement.  *Id.*  MTA also

agreed to obtain "'excess liability insurance coverage commonly

provided by Railroad operations liability insurance' in the amount

of $145 million in excess of the $ 5 million 'self-insured

retention.'"  *Id.*  Finally, the contract between MTA and CSXT

further provided that "[t]his insurance shall cover liability

assumed by [MTA] under this [Contract] . . . and shall name the

State of Maryland and [MTA] as insured.  Such insurance policies

shall name CSXT as an additional insured for CSXT's operation of

the Contract Service . . . ."  *Id.*

During the term of the contract, CSXT entered into a separate

contract, in which MTA was in no way involved nor had any prior

knowledge of, with Melvin Benhoff Sons, Inc. ("Benhoff") to pave

four public crossings along the tracks used by CSXT under its

contract with MTA.  *Id*.  Subsequently, a train operated by CSXT

pursuant to the contract with MTA collided with a backhoe being operated at the time by a Benhoff employee, totaling the backhoe but injuring no one. *Id.* at 300-01. The suit which Benhoff instituted against CSXT in Maryland State Court to recoup the losses resulting from the destruction of the backhoe eventually settled out of court for an amount deemed reasonable by MTA. *Id.* at 301. MTA then denied CSXT's subsequent claim for indemnification under the contract which resulted in the action that found its way to Maryland's highest tribunal. *Id.* at 301-02.

Writing for the majority, Justice Rodowsky examined the nature of the indemnity provision as a whole, ultimately concluding that MTA had a duty to indemnify CSXT for CSXT's own negligence. *See id.* at 302-04. The court held that because the agreement was more akin to one for insurance, the terms used by the parties contemplated that MTA would indemnify CSXT for CSXT's own negligence. *Id.* at 304. The court also found that the extensive coverage extended by MTA to CSXT under the agreement indicated that the parties were contemplating a major disaster which could only be the result of negligent operation of the commuter trains by CSXT. *Id.*

In *Empire Truck*, the Texas Court of Appeals found the UIIA to be similar in terminology and purpose to the agreement in *Mass Transit*. 285 S.W.3d at 15-16. This court agrees. The agreement at issue in this case provides, in very broad terms similar to the

40

terminology in *Mass Transit*, that Intermodal will defend and indemnify Yang Ming "against any and all claims, suits, loss, damage, or liability for bodily injury, death, and/or property damage. . . ." UIIA § F.4.  In addition, the agreement, like the agreement in *Mass Transit*, requires Intermodal to provide, to the extent permitted by law, at least $ 1,000,000 worth of liability insurance coverage for all interchange equipment and also requires Intermodal to list Yang Ming as an additional insured on Intermodal's commercial automobile liability policy.  UIIA § F.6.

Following the reasoning of the Texas court of appeals, this court finds that the parties intended Intermodal to defend and indemnify Yang Ming for Yang Ming's own negligence.  In so holding, the court joins several other courts who have analyzed similar questions of defense and indemnity arising under the UIIA and found that the terms of the UIIA provide for indemnification of the equipment provider's own negligence in light of *Mass Transit*.  *See Empire Truck Lines Inc.*, 285 S.W.3d at 16; *Garcia v. Maersk, Inc.*, No. 03-CV-5697 FB RML, 2005 U.S. Dist. LEXIS 12357 at *12-13, 2005 WL 1492380, at *4 (E.D.N.Y. June 24, 2005); *Lopez v. Louro*, No. 01 CIV 2490(JSM), 2002 U.S. Dist. LEXIS 1020, at *4-5, 2002 WL 91273, at *1 (S.D.N.Y. Jan. 23, 2002); *NYK Line*, 2004 U.S. Dist. LEXIS 13956, at *12-13.

III. CONCLUSION

For the foregoing reasons, the court finds that under the terms of the UIIA, Intermodal had a duty to defend Yang Ming in the *Miller* action.  Summary judgment is hereby granted in favor of Yang Ming.  Intermodal is ordered to pay Yang Ming's attorney fees in connection with defending the *Miller* action as well as bringing this lawsuit to enforce the parties' agreement.  Because Intermodal does not concede the reasonableness or necessity of the attorney fees claimed by Yang Ming, Yang Ming's counsel is directed to file an affidavit within fourteen (14) days of the entry of this order verifying the amount of expenses, including attorney fees, incurred by Yang Ming in providing its own defense in the underlying *Miller* action as well as in bringing this action to enforce the agreement between the parties.  Within fourteen (14) days of service of the affidavit, Intermodal shall file objections, if any, to Yang Ming's request for fees.

IT IS SO ORDERED this 16th day of February, 2010.


s/ Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE